IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs March 12, 2025

**STATE OF TENNESSEE v. PAULINE VIRGINIA SPALDING
AND CHARLES MARTIN JOHNSON**

**Appeal from the Criminal Court for Davidson County
No. 2018-C-1896    Mark J. Fishburn, Judge**

_____

**No. M2024-00044-CCA-R3-CD**

_____

Defendants Pauline Virginia Spalding and Charles Martin Johnson were jointly indicted for especially aggravated kidnapping, aggravated assault, and impersonating a police officer.  The Defendants were tried together by a jury, and the jury convicted both Defendants as charged.  The trial court sentenced Ms. Spalding to fifteen years for the kidnapping conviction, three years for the assault conviction, and eleven months, twenty-nine days for the impersonation conviction.  The trial court ordered Ms. Spalding's sentences to be served concurrently, for an effective term of incarceration of fifteen years.  The trial court sentenced Mr. Johnson to seventeen years for the kidnapping conviction, four years for the assault conviction, and eleven months, twenty-nine days for the impersonation conviction.  The trial court ordered Mr. Johnson's sentences to be served concurrently, for an effective term of incarceration of seventeen years.  In this consolidated direct appeal, Mr. Johnson challenges the sufficiency of the evidence underlying his especially aggravated kidnapping conviction and also contends that his dual convictions for especially aggravated kidnapping and aggravated assault violate double jeopardy.  Ms. Spalding contends that the trial court erred in denying the admission of certain evidence; that purported dishonesty from one of the jurors during voir dire entitles her to a new trial; and that the trial court erred in sentencing her.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JEFFREY USMAN, Sp.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and TIMOTHY L. EASTER, J., joined.

Timothy Carter, Nashville, Tennessee, for the appellant, Pauline Virginia Spalding.

Dustin Faeder, Brentwood, Tennessee (on appeal), and Ben Powers, Franklin, Tennessee (at trial), for the appellant, Charles Martin Johnson.

Jonathan Skrmetti, Attorney General and Reporter; Nicholas S. Bolduc, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy Hunter and Luis Casas, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

I.

This case arises out of an encounter in which the Defendants, two armed security guards for an apartment complex specializing in housing persons who have been released after felony convictions, posed as law enforcement officers with the Tennessee Bureau of Investigation (TBI) and forced a victim out of his vehicle at gun point in a grocery store parking lot, which was located well away from their worksite. They took the victim's keys, demanded his identification, photographed him and his driver's license, and threatened to kill him if they ever found him on their property. Before departing, they left his keys and identification. Each Defendant was charged with especially aggravated kidnapping accomplished with a deadly weapon; aggravated assault involving the use or display of a deadly weapon; and impersonating a police officer. The case was tried before a jury. The Defendants were convicted on all charges and sentenced to seventeen and fifteen years, respectively. The Defendants appeal.

Turning from an overview to the particulars, on July 4, 2018, James Kelly, who had the day off from work, was planning on attending a family cookout at his sister's house. Before the cookout, he was running errands in his large white sports utility vehicle. He stopped first at an auto parts store on Murfreesboro Road in Nashville before getting onto Briley Parkway, which is where he first noticed a black Camaro behind him. At one point, the vehicle passed him and then pulled over to the side of the road before returning to its position behind him.

Needing a few items for the cookout, Mr. Kelly stopped at a grocery store on Gallatin Pike. He noticed that the Camaro was still behind him. He pulled into the crowded parking lot and waited, with his blinker on, for someone who was pulling out of a parking spot. He noticed a man and a woman sitting in the Camaro which was still behind him.

After he parked, though he did not initially notice it, the Camaro pulled behind and perpendicular to his vehicle, which would have prevented him from backing out of his spot. On this hot July day, Mr. Kelly rolled his window down a little. He then noticed Defendant Charles Martin Johnson on the passenger side of his SUV. Mr. Johnson pointed a gun at

2

Mr. Kelly and told him to "get the f[**]k out." Mr. Kelly thought the gun was an assault rifle. Mr. Johnson was "screaming" and "pretty hostile;" Mr. Johnson told Mr. Kelly that he was "a suspect in a homicide" on "TBI property." A security camera video recording shows nearby persons moving away from this encounter.

Responding to Mr. Johnson's demand that he get out of the SUV, Mr. Kelly began to open his driver's door and discovered that Defendant Pauline Virginia Spalding was "right there." He got out of his vehicle, "waiting to be handcuffed or something . . . just like anybody would be if you've been accused of a murder." Instead, Ms. Spalding directed him to "move a little further up from the car." Mr. Kelly stated that Ms. Spalding was wearing khakis, a black t-shirt, a bullet-proof vest, and a chain with a badge on it. He noticed that she "had a glock" in a holster at her side. One of her hands was resting on the gun.

Once Mr. Kelly was out of the SUV, Mr. Johnson reduced the volume of his voice but continued in a threatening manner. Like Ms. Spalding, Mr. Johnson was dressed in khaki pants, a black shirt, and body armor. He wore a non-descriptive badge on a chain around his neck. Mr. Johnson questioned Mr. Kelly about what business he had on "TBI property." During their interaction, Mr. Johnson told Mr. Kelly that, if he ever found him on his property again, Mr. Johnson would kill him.

Mr. Johnson demanded to see Mr. Kelly's identification. When Mr. Kelly produced it, the Defendants took photographs of both the ID and Mr. Kelly. At this point, Mr. Johnson's gun was hanging from a strap around his neck. Mr. Kelly thought that Mr. Johnson was a law enforcement officer. Mr. Kelly did not feel free to leave and feared that he would be shot if he tried to leave.

Ms. Spalding asked Mr. Kelly if he was a cop. The question made no sense to Mr. Kelly, and at this point, he surmised that "something [was] not right." Mr. Kelly asked the Defendants who they were with, and Mr. Johnson responded, "TBI." Mr. Kelly asked to see some identification; Mr. Johnson responded, "F off." Mr. Johnson then motioned to Ms. Spalding and said, "[L]et's go." Before leaving, Mr. Johnson tossed Mr. Kelly's keys onto the hood of a neighboring car. Mr. Kelly did not recall how Mr. Johnson had gotten his keys. Mr. Johnson also laid Mr. Kelly's driver's license on the hood of Mr. Kelly's SUV. The Defendants left without providing any identification to Mr. Kelly.

Having become suspicious, Mr. Kelly used his phone to film the Defendants leaving. Mr. Kelly also promptly called 911. An audio recording of the call was admitted into evidence. In it, Mr. Kelly describes the encounter as follows:

> C[aller]: Listen I'm here at Kroger's off of . . . um . . . Gallatin [R]oad. I don't know what was going on, it[']s like two individuals, a man and a woman approached my vehicle, they, I don't know if they were real officers

or not. But they asked me to get out of the vehicle. And, ahh, one had like an assault weapon. They [took] off before I could leave. They wouldn't let me get, you know, a picture or nothing of their car. They were in like a black . . . uhh like a black Camaro. Umm, I tried to take a quick video. They're saying that somebody, you know, I guess somebody either, somebody that had a vehicle like I was in was on their property or something and they claim to be like TBI. Is what they kept saying.

. . . .

C[aller]: . . . I'm a little startled, a guy pulled up on me –

. . . .

D[ispatcher]: Okay, and how long ago did this happen?

C[aller]: This is, this is, it just happened. As soon as I get off the phone with you – I thought they were just going to shoot me in the car. It was a man and a woman. The man looked like he had an AR 15 or something.

D[ispatcher]: Okay, did they threaten you with these weapons?

C[aller]: Yeah, yeah, yeah, he did. He told me to get out the car right now. He had his weapon drawn. And she, she had hers getting ready to draw. She came up my passenger side, and um can you send a car up here?

D[ispatcher]: Okay, are they still there[?]

C[aller]: No. No, the[y're] gone. They left immediately. They took a picture of my ID and took off immediately.

The recording of Mr. Kelly's call ends with a conversation that occurs between Mr. Kelly and a "person not on phone," during which Mr. Kelly states the following:

Two people claiming to be TBI pulled in right behind me. One guy (indistinguishable), the guy looked like he, I'm not familiar with assault weapons, but it looked like an AR 15 or whatever. They took a picture of my license and they said that I was on their property, but I had come from their property. But I come up from Hamilton Inn where I'm staying. I took a picture.

The call then ended.

4

Mr. Kelly indicated that he spoke briefly with a male officer who was already on-site for a different matter. He did not get this officer's name. Mr. Kelly told this officer that he had "just been held up" and that "someone had just come up to [his] car with an assault firearm." On cross-examination Mr. Kelly was asked, "is it your testimony today that you did not tell this officer that that weapon was . . . in the Camaro?" Mr. Kelly responded, "Yes. If I told him it was in the car, it was because he took it with him."

Officer Faye Denson of the Metro Nashville Police Department was dispatched to the scene. When she arrived, she spoke with Mr. Kelly for approximately forty-five minutes to an hour. She described his demeanor as "very shaken up" and "frightened." Officer Denson indicated that Mr. Kelly described the male perpetrator as having "like an AK-15" and the female having a "handgun." Mr. Kelly reported that the white male "who was the driver of the vehicle, asked for his driver's license." He added that "[t]hey took a picture of his driver's license. They told him to stay off of – stay the F off of TBI property." Mr. Kelly added that the white female "was also outside her vehicle and she had a handgun with her badge on."

Mr. Kelly showed Officer Denson the video he took of their car as it left the scene. From the video, Officer Denson recovered the license plate number and ran it through the registry. The registry produced the names of two drivers, Brian Madden and Pauline Spalding. Officer Denson pulled up photographs of these two persons and showed them to Mr. Kelly. Mr. Kelly identified the female as the passenger in the car. Officer Denson called her dispatcher and requested a check to see if there were any TBI agents in the area or any Metro police officers. She was informed that there were no TBI agents in the area.

On cross-examination, Officer Denson was asked about an exchange she had with dispatch shortly after her arrival at the scene. Dispatch informed her of a code change as to the call for which she was responding. The code change involved "12 to 54" and "is going to be a man that says someone in a car took a picture of his ID and they had an assault weapon inside the vehicle and the vehicle pulled off." Asked about the discrepancy between the dispatch report and Mr. Kelly's "story that the assault rifle was in the hands of the male" she responded, "[s]ometimes when we get our narrative and stuff from the dispatch, it's different from when you talk to the victim. So it could be more accurate when you talk to somebody than compare[d] to what the dispatcher says." Asked about the code "54," she explained that it meant "[s]omebody on the premises with a weapon somewhere." Asked about what would cause dispatch to change a code assigned to an incident, Officer Denson explained that, while dispatch can "spontaneously change" a code, such changes were usually up to the officer or a sergeant.

Officer Denson also spoke with a male officer, who had been in the grocery store parking lot for another matter, at the scene. She acknowledged that it was possible that he had called in a code change, but she did not know if that occurred. She conceded that her report did not state that the incident was at gunpoint.

A couple of days after the encounter, Mr. Kelly also reported the incident to the TBI. TBI Special Agent Michael Frizzell investigated. He was able to determine that Ms. Spalding owned the vehicle that appeared in Mr. Kelly's recording and that there was no record of Mr. Johnson or Ms. Spalding working for the TBI. He passed this information along to Metro Detective Jesse Holt, who had taken over investigating the matter on behalf of the Metropolitan Nashville Police Department.

Detective Holt interviewed both the Defendants. During his interview with Mr. Johnson, Detective Holt falsely indicated to him that Mr. Kelly had an audio recording of the confrontation. Detective Holt recorded his conversations with the Defendants. Mr. Johnson conceded that he and Ms. Spalding had confronted the "wrong person." He also conceded that he had mentioned a "homicide" to Mr. Kelly and that he had put Mr. Kelly's driver's license on the hood of his car at the at end of the incident. While agreeing that he was carrying a gun longer than a pistol, Mr. Johnson denied pointing the gun at Mr. Kelly. Mr. Johnson also told Detective Holt that he had the safety on and that he had not put his finger on the trigger because he "had no intention of using force" against Mr. Kelly. Regarding a TBI reference being made during the encounter with Mr. Kelly, Mr. Johnson confirmed that he had made reference to the TBI in the interaction with Mr. Kelly. Mr. Johnson, however, indicated that the apartment complex at which he is a security guard is "overseen by the TBI" because its occupancy includes an incredibly high percentage of registered sex offenders.

In the interview with Ms. Spalding, she denied that any reference had been made to the TBI. She also stated that the gun carried by Mr. Johnson was actually a nine-millimeter and not a larger gun. Ms. Spalding also denied that they held Mr. Kelly at gun point.

As for what had precipitated the encounter between Mr. Kelly and the Defendants, Ms. Spalding offered, at trial, a circuitous explanation. She indicated that she and Mr. Johnson were both armed security guards at an apartment complex in Nashville. In addition to working at the apartment complex, she also lived there. She and Mr. Johnson were also involved in a romantic relationship. Many residents of the apartment complex were registered sex offenders due to its location outside of areas restricted under the sex offender registry. Ms. Spalding made certain the registered sex offenders at the apartment complex remained in contact with their probation officers, reporting them if they did not.

About a month before the incident, Ms. Spalding went to a Metro impound lot to recover personal items from a wrecked car that belonged to her daughter. In the car, she found a cellphone. After she took it home and charged it, she found content on the cell phone that she described as "very bad." Ms. Spalding indicated that there was involvement with drugs. She attempted to turn the phone over to various law enforcement officers, but she indicated that none of them took it.

On the day of the incident, Ms. Spalding noticed that the cellphone "was doing some kind of mapping on it" without any input from her. It appeared to be tracking a vehicle coming to her apartment complex. She asked Mr. Johnson to check if the vehicle was at the property. In looking for the vehicle, Mr. Johnson found a "Mr. Wilkins," who was "looking for a cellphone." Mr. Johnson took a photograph of Mr. Wilkins's driver's license, and Ms. Spalding texted the photograph to Detective David Elliot, a Metro law enforcement officer to whom she had previously provided information. Mr. Johnson also instructed Mr. Wilkins to leave the property, and Ms. Spalding then saw the cellphone tracking his movements with "little feet walking."

Ms. Spalding wanted to know more about Mr. Wilkins, so she and Mr. Johnson got in her car, a black Camaro, and "drove down the road to see if [they] could talk to him." As they drove, they saw a large white SUV that Ms. Spalding thought was being driven by Director Brian Kelly Murphy,[1] another law enforcement officer with whom Ms. Spalding was familiar. She had previously seen Director Murphy in a similar looking vehicle. Ms. Spalding thought she saw Mr. Wilkins get into the SUV based upon the movements on the tracking device. She saw the SUV sitting in front of an automotive store. She called Director Murphy, who told her that he was not in town and was not driving the white SUV she was watching. Ms. Spalding, however, did not believe him and decided to follow the SUV. Defendants Johnson and Spalding followed the SUV into the grocery store parking lot.

As for what occurred in the parking lot, Ms. Spalding agreed that the Defendants pulled behind Mr. Kelly's vehicle and that both she and Mr. Johnson approached the vehicle. After that point, her rendition of events varied dramatically from those of Mr. Kelly. She stated that she was not armed but that she assumed that Mr. Johnson likely had his nine-millimeter gun with him that day. She denied that a gun was ever pointed at Mr. Kelly. She indicated that, upon realizing that he was not Director Murphy, she stood near the hood of his vehicle and conversed with Mr. Kelly after he exited his vehicle. According to Ms. Spalding, Mr. Kelly was "really nice" and "really friendly" during their conversation. She stated that she handed Mr. Kelly a photograph of Mr. Wilkins's driver's license and asked Mr. Kelly if he knew the man. He indicated that he did not know him.

At this point, according to Ms. Spalding, Mr. Johnson joined them. She and Mr. Johnson explained to Mr. Kelly that they were associated with a property and many of the residents at this property were "registered with the sex offender registry with the TBI." Ms. Spalding stated that that was the only time the TBI was mentioned in the conversation. She denied that either she or Mr. Johnson represented that they were with the TBI or law enforcement. She indicated that she also explained to Mr. Kelly that, because they were having a conversation, she had to "get [his] information." She testified that, "any time we have interaction with anybody, you know, we just make a report and we just file it, anybody

---

[1] Brian Kelly Murphy served as the director of the Eighteenth Judicial District Drug Task Force.

we talk to." She said that the reports were filed in their office. He pulled out his driver's license. She also took a picture of the license and Mr. Kelly. After having obtained this information, according to Ms. Spalding, their interaction came to a close.

Detective Elliott, who had retired from the Metro Police Department as a detective and was then hired back by the Department to work part time "in the sex offender registry office," was also called to testify. Detective Elliott testified that he met Ms. Spalding in the mid 2010s while he was attempting to serve a warrant on someone at the apartment complex at which she worked. He indicated that Ms. Spalding would contact him occasionally about problems she was having with tenants or "violations of the law she may have noticed." He stated that she had been a witness in a case that he had worked on and that it was not uncommon for her to send him tips to his cellphone. He acknowledged that she sent him a text message including a photograph of someone's driver's license in July 2018.

On cross-examination, Detective Elliott indicated that he eventually asked Ms. Spalding to stop calling him. He explained his reasons for doing so:

> Prior to her meeting [Mr. Johnson] . . . she was very proactive as one probably would need to be working security and management at that hotel, but her proactiveness seemed to be a little more aggressive, probably too much, and it seemed to coincide with her dating [Mr. Johnson].

On re-direct, Detective Elliott acknowledged that he had successfully prosecuted cases based on tips provided by Ms. Spalding.

Brian Murphy, also called by Ms. Spalding, testified that he was the director of the Eighteenth Judicial District Drug Task Force. Director Murphy stated that he had known Ms. Spalding since around 2008. He testified, however, that she had never been employed by the Task Force, had never worked with him in any law enforcement capacity, and was not "a documented informant." He did acknowledge that the Task Force had "received communications from her regarding criminal issues," and recalled in particular a steroid case that he met with her on. Director Murphy testified that Ms. Spalding had been in "pretty frequent conversation" with him in relation to a case her daughter had pending in Sumner County. He also stated that the Task Force did have several white SUVs, that Ms. Spalding had previously seen him driving such a vehicle, and that he had received several messages from her on July 4, 2018.

Ms. Spalding also called Jennifer Herlein, the custodian of records for the Department of Emergency Communications. Ms. Herlein explained that she maintained the audio recordings of 911 and dispatch phone calls. Pursuant to a subpoena issued in this case, she compiled a collection of "the phone calls and the radio traffic between the dispatchers and the officers" in this matter. She acknowledged that one of the recordings

8

began at 1:16:02 p.m. on July 4, 2018. When Ms. Spalding sought to play this recording for the jury, accompanied by a transcript, the State objected on the basis that the recording was "hearsay within a business record." The trial court sustained the objection, noting that the State "can't cross examine the dispatcher" and that "[t]he dispatcher doesn't know where this information came from." Before the jury, Ms. Herlein explained that the "codes" assigned to calls received by dispatch could be changed during the course of an investigation. For example, a code assigned to an initial 911 call might be changed after a responding officer evaluated the situation and reported back.

Addressing the testimony of Detective Elliott and Director Murphy, Ms. Spalding asserted that they had both lied. She also claimed that, since December 2015, she had "turn[ed] in . . . a lot of dirty Metro Police Officers, [and] not just from Metro either." She testified that she turned them in to "somebody from TBI." She also added that she turned Detective Elliott and Director Murphy "into the accountability four years ago." Ms. Spalding also claimed that Detective Holt altered the audio recording of their conversation.

On rebuttal, Mr. Kelly testified that Ms. Spalding's description of their interaction was "fictional to actually what happened." He stated, "[t]here was no jovial conversation between us. In fact, it was more like interrogation." Asked if there was anything about the encounter that he considered "polite," he responded, "[n]othing that I can think of." Also called in rebuttal, Detective Holt denied that he edited the audio recording of the statements he took from Defendants.

After considering this proof, the jury convicted both Defendants as charged. After a joint sentencing hearing, the trial court sentenced Ms. Spalding as a Range I offender to fifteen years for the especially aggravated kidnapping conviction; three years for the aggravated assault conviction; and eleven months, twenty-nine days for the impersonation conviction. The trial court ordered these sentences to be served concurrently for an effective sentence of fifteen years' incarceration. The trial court sentenced Mr. Johnson to seventeen years for the especially aggravated kidnapping conviction; four years for the aggravated assault conviction; and eleven months twenty-nine days for the impersonation conviction. The trial court ordered these sentences to be served concurrently for an effective sentence of seventeen years' incarceration.

While Mr. Johnson does not appeal any sentencing issue, Ms. Spalding challenges the trial court's sentencing determination in denying her mitigated offender status. At the sentencing hearing, the defense presented proof about the positive impact that Ms. Spalding had made in managing the apartment complex. She also presented the testimony of Dr. Brian Bitting, a clinical psychologist. After interviewing Ms. Spalding for several hours after her convictions, he prepared a report which was admitted into evidence. Dr. Bitting testified that Ms. Spalding "meets criteria for Somatic Symptom Disorder and an unspecified neurocognitive disorder." He added, "it would be very useful to have a

comprehensive medical and neuropsychological evaluation to really figure out what's going on with the cognitive aspects of her presentation."

Dr. Bitting's written report ultimately concludes as follows:

Most recently, Ms. Spalding was in a romantic relationship with an abusive partner [Mr. Johnson] and the totality of the data suggests he exhibited coercive control over her.  Considering her long history of law abiding, substance free living, but her recent drug use, withdraw[l] from her family, endorsement of conspiratorial beliefs, and arrest for the current crimes, the data suggest her behavior in the year preceding her arrest and during the instant offence was strongly influenced by the exertion of control over her by [Mr. Johnson].

On cross-examination, Dr. Bitting acknowledged that Ms. Spalding had told him that she had used methamphetamine "multiple times a week" after she was arrested on these charges.

After the close of proof, the State argued that Ms. Spalding's sentence should be enhanced on the basis of her criminal behavior in using methamphetamine; her leadership role in the commission of the instant offenses; and her using a professional license as a security guard in a manner that significantly facilitated the commission of the instant offenses.  Counsel for Ms. Spalding argued that she should be sentenced as an especially mitigated offender.

The trial court first determined that Ms. Spalding was a Range I offender.  The trial court next concluded that the enhancement factor for previous criminal behavior applied because of Ms. Spalding's admitted use of illicit drugs.  The trial court then concluded that the enhancement factor for being a leader in the commission of these offenses was also applicable.  The trial court explained its reasoning: "Ms. Spalding kind of got the ball rolling on this and it began a snowball effect.  And it just got bigger than life itself, but that – and there's no question that she's the one that pushed them to pursue the victim in this case."  The trial court declined to apply any other enhancement factor.

In mitigation, the trial court determined that Ms. Spalding committed these offenses "under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct."  The trial court also considered Ms. Spalding's "community service and efforts in working in the community."  The trial court specifically recognized its obligation to impose a sentence that represented "the least severe measure necessary to achieve the purpose for which it is being imposed."

The trial court sentenced Ms. Spalding to the minimum sentences for her felony convictions: fifteen years for the especially aggravated kidnapping offense and three years

for the especially aggravated assault offense.  The trial court imposed a sentence of eleven months, twenty-nine days for the misdemeanor offense of criminal impersonation of a law enforcement officer.  The trial court ordered all three sentences to be served concurrently, for an effective term of fifteen years' incarceration.

On appeal before this court, Mr. Johnson advances 2 issues.  These are:

(1) Was the evidence sufficient to find Mr. Johnson guilty of Especially Aggravated Kidnapping?

(2) [I]n the alternative, is Mr. Johnson's conviction for Aggravated Assault a lesser-included offense of Especially Aggravated Kidnapping, such that these offenses should merge into one conviction?

Ms. Spalding raises 3 issues on appeal before this court.  These are:

(1)  Did the Trial Court improperly deny evidence of a dispatch transmission to be introduced during the Trial.

(2) Was a Juror's dishonesty regarding his criminal history and his experience with the criminal justice system during Jury Selection sufficient to grant a New Trial.

(3) Did the Trial Court improperly apply Sentencing enhancement factors during the sentencing hearing when denying mitigated offender status.

II.

A.

We begin by addressing the issues raised by Mr. Johnson on appeal before this court, starting with his challenge to the sufficiency of the evidence to support his conviction for especially aggravated kidnapping.  When considering an argument that the evidence presented was insufficient to support a conviction, we must determine whether "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *accord State v. Rimmel*, 710 S.W.3d 640, 645 (Tenn. 2025); *see also* Tenn. R. App. P. 13(e).  Because a guilty verdict replaces the defendant's presumption of innocence with a presumption of guilt, the defendant bears on appeal the burden of demonstrating that the evidence is insufficient to sustain his convictions.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).  "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact."  *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008).  The State is accorded the strongest

legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.*

As charged in this case, especially aggravated kidnapping is defined as "false imprisonment . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-305(a)(1). False imprisonment, in turn, is committed when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). "'Unlawful' means, with respect to removal or confinement, one that is accomplished by force, threat or fraud." Tenn. Code Ann. § 39-13-301(15).

Mr. Johnson was also charged with aggravated assault, defined as charged in this case as intentionally or knowingly causing another to reasonably fear imminent bodily injury and involving the use or display of a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(2), 39-13-102(a)(1)(A)(iii).

When these two crimes arise out of the same incident, the Tennessee Supreme Court requires the trial court to instruct the jury that it must determine "whether the removal or confinement [required for the especially aggravated kidnapping conviction] is, in essence, incidental to the [aggravated assault] or, in the alternative, is significant enough, standing alone, to support a conviction." *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012). The trial court in the present case provided such instructions, and Mr. Johnson does not contend that the trial court erred in its instructions to the jury on this question.

The Tennessee Supreme Court has "determined . . . that the question of whether a kidnapping was 'essentially incidental' to an accompanying offense is a question of fact for a properly instructed jury." *State v. Alston*, 465 S.W.3d 555, 561 (Tenn. 2015). Our review in a challenge to this determination is a conventional sufficiency of the evidence assessment. *Id.* at 561-62.

Viewing the evidence in the light most favorable to the prosecution, Mr. Johnson completed an aggravated assault against Mr. Kelly when he pointed his gun at Mr. Kelly, causing Mr. Kelly to fear being shot. *See, e.g.*, *State v. Sanders*, No. W2014-01455-CCA-R3-CD, 2015 WL 3990707, at *6 (Tenn. Crim. App. July 1, 2015) (defendant committed aggravated assault when he pointed a gun at victim through car window, causing victim to be afraid); *State v. Harris*, 30 S.W.3d 345, 354 (Tenn. Crim. App. 1999) ("Embrey committed the offense of aggravated assault by pointing a gun at Horton and putting him in fear for his safety."); *State v. McKheen*, No. 03C01-9706-CR-00209, 1998 WL 40229, at *4 (Tenn. Crim. App. Feb. 3, 1998) (defendant committed aggravated assault when he pointed a gun at the victim while she was in her car and victim feared imminent bodily injury). Indeed, Mr. Johnson does not dispute that the evidence is sufficient to support his

12

conviction of that crime. Mr. Johnson instead challenges whether his actions subsequent to pointing his gun at Mr. Kelly were incidental to his commission of aggravated assault.

Reviewing the evidence in the light most favorable to the State, we conclude the evidence was sufficient that a rational trier of fact could conclude that Mr. Johnson committed especially aggravated kidnapping as a non-incidental offense accompanying an aggravated assault. Mr. Johnson initially approached Mr. Kelly's vehicle on the passenger side and pointed a gun at him, ordering him to get out of his car. Mr. Kelly did what was demanded of him. He testified that he was afraid of being shot if he tried to leave the encounter.

In addition to causing Mr. Kelly to fear imminent bodily injury by the display of a deadly weapon, Mr. Johnson ordered Mr. Kelly to get out of his car, thereby interfering with Mr. Kelly's liberty to remain in his vehicle. As Mr. Kelly began to get out of the SUV as ordered, he found Ms. Spalding standing "right there." She ordered him to move "a little further up" while resting her hand on her sidearm. Still holding his gun, Mr. Johnson demanded to see Mr. Kelly's identification. Mr. Johnson took Mr. Kelly's driver's license as well as Mr. Kelly's keys. The Defendants did not return his keys but left them on the hood of a nearby vehicle. They also parked the Camaro in such a manner that Mr. Kelly could not back his vehicle out of the parking spot even if he had maintained possession of his keys. Mr. Kelly testified that he believed Mr. Johnson "would have shot [him] had [he] tried to leave." From the video recording, it is clear that the encounter lasted two to three minutes.

Mr. Johnson's crime of aggravated assault was complete as soon as Mr. Kelly became aware that Mr. Johnson was pointing a gun at him, causing him to fear being shot. Mr. Kelly's deprivation of liberty continued for two minutes after that point. After being ordered out of his vehicle at gunpoint, he was "bookended" by two people with guns and badges, ordered to move several feet away from his driver's side door, and deprived of his driver's license and car keys.

This court has recognized that "[t]he statutory elements of aggravated kidnapping do not require a finding that the Defendant moved the victim any specific distance or restrained her for any particular length of time in order for the Defendant's actions to substantially interfere with the victim's liberty." *State v. King*, 703 S.W.3d 738, 763 (Tenn. Crim. App. 2024); *accord State v. Turner*, 41 S.W.3d 663, 670 (Tenn. Crim. App. 2000) (affirming conviction for especially aggravated kidnapping where victim was detained for a "relatively brief" period while driving a "relatively short" distance – approximately the time needed for one of two Defendants to point the gun at victim's leg and then her head and debate shooting her with other defendant before she jumped from the car to safety); *State v. Waller*, No. W2012-02591-CCA-R3-CD, 2014 WL 1168610, at *7 (Tenn. Crim. App. Mar. 21, 2014) (upholding especially aggravated kidnapping conviction "although the detention was [between five and ten minutes] and although the victim was not moved

13

as part of the kidnapping," noting that "[t]he kidnapping statutes do not require proof of a particular distance or time of detention") (citing *White*, 362 S.W.3d at 576). Additionally, kidnapping is considered to be a "continuing offense," *State v. Legg*, 9 S.W.3d 111, 118 (Tenn. 1999), such that the perpetrator "continues to commit the crime [of kidnapping] at every moment the victim's liberty is taken." *Id.* at 117.

In this case, Mr. Johnson argues that "Mr. Kelly's extraordinarily minor deprivation of liberty was essentially incidental to having a gun pointed at him." However, the evidence presented was such that a rational juror could disagree. The crime of aggravated assault with a deadly weapon does not include a "free period" following the initial brandishing of the gun during which the perpetrator may continue to terrorize his or her victim, demanding compliance with varying demands without the potential for additional criminal consequences. Nor was the Defendants' interference with Mr. Kelly's liberty – first by forcing him to exit his SUV and then by immobilizing him – inherent in the nature of aggravated assault with a deadly weapon. Assessed under the applicable standard, a rational trier of fact could conclude that the Defendant's removal and confinement of Mr. Kelly was significant enough to support his convictions of especially aggravated kidnapping. Mr. Johnson is not entitled to relief on this basis.

B.

We turn next to Mr. Johnson's double jeopardy argument. Mr. Johnson also contends that his dual convictions for especially aggravated kidnapping and aggravated assault violate the constitutional prohibition upon double jeopardy. The State points out that Mr. Johnson failed to raise this issue in his motion for new trial and asserts that this issue is thereby waived, relying on our Supreme Court's opinion in *State v. Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018). *Harbison* states that, in order to preserve a double jeopardy issue, a convicted defendant must raise the issue in his motion for new trial. *Id.*

Nevertheless, in the interest of justice, this court may review his claim of double jeopardy for plain error. *See State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016). This court has previously elected to review claims of double jeopardy violations for plain error. *See, e.g., State v. Derring*, No. W2017-02290-CCA-R3-CD, 2019 WL 244471 (Tenn. Crim. App. Jan. 16, 2019). However, Mr. Johnson is not entitled to relief under plain error review unless five factors are established: (1) the record clearly established what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of Mr. Johnson was affected; (4) Mr. Johnson did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *See Martin*, 505 S.W.3d at 504.

In this case, he cannot make that showing. Under both our federal and state constitutions, the Double Jeopardy Clause prohibits a person from being convicted twice for the same crime. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 10. This prohibition

14

provides three distinct protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

Here, Mr. Johnson contends that the two different statutes for especially aggravated kidnapping by use or display of a deadly weapon and aggravated assault by use or display of a deadly weapon both punish the same offense. This is an example of a "multiple description claim." *See State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014). We analyze a multiple description claim pursuant to the approach set forth in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *See Smith*, 436 S.W.3d at 767; *White*, 362 S.W.3d at 556.

> In a *Blockburger* analysis, our primary focus is whether the General Assembly expressed an intent to permit or preclude multiple punishments. If either intent has been expressed, no further analysis is required. When the legislative intent is unclear, however, we must apply the "same elements test" from *Blockburger*. Under this test, the first step is to determine whether the convictions arise from the same act or transaction. The second step is to determine whether the elements of the offenses are the same. If each offense contains an element that the other offense does not, the statutes do not violate double jeopardy.

*Smith*, 436 S.W.3d at 767 (internal citations omitted).

Neither of the relevant statutory provisions in this case contains an expressed intent to either permit or preclude multiple punishments. *See State v. Shaw*, 715 S.W.3d 340, 346 (Tenn. Crim. App. 2024) (concluding that for the offenses of especially aggravated kidnapping and aggravated assault it is necessary to move beyond considering clearly expressed intent and deeper into a *Blockburger* analysis). In the present case, both convictions arose from the same transaction and involve the same victim. Accordingly, we must determine whether the elements of the offenses are the same, or whether each offense contains an element that the other offense does not.

As set forth above, especially aggravated kidnapping as charged in this case is defined as "false imprisonment . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-305(a)(1). False imprisonment requires the removal or confinement of the victim so as to interfere substantially with the victim's liberty. Tenn. Code Ann. § 39-13-302(a). Aggravated assault as charged in this case, in contrast, is defined as intentionally or knowingly causing the victim to reasonably fear imminent bodily injury and involving the use or display of a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(2), 39-13-102(a)(1)(A)(iii).

15

Even a cursory review of the statutory elements of these two crimes reveals that they each contain an element that the other does not. Especially aggravated kidnapping requires that the victim be moved or confined. Aggravated assault does not. Aggravated assault as charged here requires that the victim be put in fear of imminent bodily injury. Especially aggravated kidnapping does not.[2]

Clearly, these two statutes do not describe the "same offense" for double jeopardy purposes. *See State v. Tittle*, No. M2016-02006-CCA-R3-CD, 2017 WL 4773427, at \*9 (Tenn. Crim. App. Oct. 23, 2017) (holding that dual convictions for attempted aggravated kidnapping and aggravated assault, both involving the use of a knife, were not barred by double jeopardy because attempted aggravated kidnapping includes the removal or confinement of the victim and aggravated assault requires that the defendant caused the victim to reasonably fear imminent bodily injury). Accordingly, no clear and unequivocal rule of law was breached when the trial court imposed two punishments for these two offenses. Because Mr. Johnson cannot establish the second requirement for plain error relief, we need not consider the remaining plain error factors. *See State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020) ("If a defendant fails to establish any of these criteria, an appellate court must deny relief under the plain error doctrine, and an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established.") (quoting *Minor*, 546 S.W.3d at 67).

Accordingly, we conclude that Mr. Johnson is not entitled to relief on his claim of a Double Jeopardy violation.

III.

As noted above, Ms. Spalding contends that she is entitled to a new trial because one of the jurors failed to disclose past criminal convictions and because the trial court erred by denying the admission of certain hearsay proof. She also argues that the trial court erred by not sentencing her as an especially mitigated offender.

We note that there are irregularities in the record regarding the motions for new trial filed by the Defendants. The motion for new trial filed by Mr. Johnson and contained in the technical record lists three issues: (1) the trial court's exclusion of evidence of a dispatch transmission between Officer Denson and the dispatcher; (2) the dishonesty of the jury foreman about his criminal convictions; and (3) the admission of photographs of "random firearms." The technical record does not contain a copy of Ms. Spalding's motion

---

[2] Defendant Johnson contends in his reply brief that, "[w]hen the upcharge to *Especially* Aggravated Kidnapping is based on [its being accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon], the legislature plainly intended for part of the reason for the upcharge to be that the victim is controlled through their fear of a deadly weapon being used against them." Essentially, Defendant Johnson asks us to add language to the relevant statutory provisions. We decline to do so.

for new trial, although the transcript of the joint hearing on the Defendants' motions for new trial includes the trial court asking counsel for Ms. Spalding, "Can we get your motion for new trial so we can make a copy? We can't seem to locate it in the court file." Counsel responds, "I cannot find it in my court file either. I'll e-mail it to Mike here right now." The trial judge asks counsel to "e-mail a copy of it to me," and counsel responds, "I'll send it on the same one we've all been sending on for this case." At the end of the hearing, counsel for Ms. Spalding states, "I'm sending it [the motion for new trial] right now, Judge." Nevertheless, the technical record does not contain a copy of Ms. Spalding's motion for new trial. It does, however, contain a copy of her memorandum in support of her motion for new trial, "with arguments as it relates to issues 1 and 4 of the Motion for New Trial filed by Ms. Spalding." Issues 1 and 4 are identified as relating to Ms. Spalding's motion to sever her case from Mr. Johnson's, and to the trial court's sentencing of Ms. Spalding.

At the motion for new trial hearing, counsel for Ms. Spalding adduced proof regarding the juror issue and the issue regarding the recorded transmission between Officer Denson and the dispatcher. Counsel for Mr. Johnson did not adduce any proof or examine either of the witnesses called by counsel for Defendant Spalding. In its written order addressing the motions for new trial, the trial court stated that the matter was "before the court upon the Motion for New Trial filed by each of the Defendants . . . ." It then set forth its rulings on two issues it identified under the heading "Pauline Spalding," those issues being the denial of her severance motion and her sentences. Under the heading "Charles Johnson," it set forth its rulings on three issues: "Error in declaring inadmissible properly authenticated dispatch records"; "Misconduct by jury foreperson"; and "Error in admitting generic internet photo[s] [of guns]."

Given that the memorandum in support of Defendant Spalding's motion for new trial clearly references four issues, and given Defendant Spalding's presentation of proof regarding the first two issues identified by the trial court as set forth by Mr. Johnson, we infer that the other two issues set forth in Ms. Spalding's motion for new trial were the same as the first two issues set forth in Mr. Johnson's motion for new trial. The trial court accepted Defendant Spalding's proof on these issues. The State has not raised any issue with respect to the missing copy of Ms. Spalding's motion for new trial and has responded on the merits to her issues on appeal. Accordingly, we will address all three of her issues on appeal on their merits, beginning with her contention that she is entitled to a new trial due to misconduct by one of the jurors.

A.

As noted above, Ms. Spalding raises on appeal a challenge to her conviction based upon purported dishonesty from a juror. During voir dire, as part of a set of multiple questions posed to each juror, the prosecuting attorney asked the potential jurors: "Have you ever been the victim of a crime before? Have you or somebody that you care about

17

ever had an encounter with the police?" In response to these queries, prospective juror J.E.K. stated, "I had my car stolen once about twenty years ago. I've had a speeding ticket."

At the hearing on Ms. Spalding's motion for new trial, she called Melvin S. Brown, Jr., a licensed private investigator, to testify. Mr. Brown explained that, at the behest of Ms. Spalding, he conducted an investigation into "the person that was on the Jury identified as [J.E.K.]." During the course of his investigation, he discovered a misdemeanor conviction for "Assault – Fear of Bodily Injury" and a misdemeanor conviction for "Resisting Stop, Frisk, Halt, Arrest, or Search" both dated June 19, 2001. Both convictions were of a person named J.E.K. and were entered by a Davidson County General Sessions judge. Certified copies of the convictions were admitted into evidence. Neither conviction identifies the defendant by any information other than name. However, Mr. Brown testified that his investigation revealed that the address associated with the J.E.K. identified in the convictions was on Duke Street. He used the website Truth Finder to investigate J.E.K. and determined that the name was associated with two addresses: one on Duke Street and one on Ringgold Drive. The jury pool document associated with this case was also introduced into evidence. That document indicates that J.E.K. resides on Ringgold Drive. Ms. Spalding did not call Juror J.E.K. to testify at the hearing.

During argument on the motion for new trial, counsel for Ms. Spalding asserted that Juror J.E.K.'s failure to disclose his prior misdemeanor convictions was evidence of bias, entitling her to a new trial. Counsel stated, "He certainly remembered his speeding tickets. So he seemed to intentionally leave [his convictions] out to find his way onto this Jury. And we do think that did create prejudice in this case or at least the appearance of it." Counsel proffered an explanation for Juror J.E.K.'s interest in being on the jury:

> this is a case of impersonating police officers, of two white people accosting a black man in a parking lot. And here, we have a black Juror unfortunately – and I hate to bring race into this at all, but that is a fact – who makes this – who becomes Foreman of all things and lies about his criminal history which includes having trouble with police officers and resisting arrest.

The State responded by, first, vehemently denying that race had anything to do with this case and, second, pointing out that if the convictions prompted any sort of bias, they were more likely to bias J.E.K. against the State.

In its order denying the motion for new trial, the trial court found that "the failure to disclose does not reflect directly on the juror's lack of impartiality as the non-disclosure relates to a twenty-year-old misdemeanor assault for which the juror successfully completed six months of probation." The trial court concluded that the defense had failed to meet its burden of showing prejudice or bias in this case.

18

Before this court, Ms. Spalding argues that Juror J.E.K.'s failure to disclose his prior convictions was presumptively prejudicial and that, accordingly, the trial court erred in finding that she failed to carry her burden of demonstrating bias. While asserting that the failure to disclose was presumptively prejudicial, she concedes that the case law in this area suggests that she still may have a burden to prove prejudice. Nevertheless, Ms. Spalding argues that such an approach would not fit with general understanding of the operation of legal presumptions. She requests relief in the form of a new trial or, alternatively, that "this matter be remanded back to the Trial Court with instructions to consider the presumption created by [J.E.K.]'s dishonesty and determine what evidence preponderates against presumption and therefore against the relief of a New Trial."

Both the United States Constitution and the Tennessee Constitution guarantee a criminal defendant the right to a trial before an impartial jury. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Whether this right has been violated by the presence of a biased juror is a mixed question of law and fact which this court reviews de novo, with a presumption of correctness attaching to the trial court's findings of fact. *See Rattler v. State*, No. E2020-01533-CCA-R3-PC, 2021 WL 3737058, at *3 (Tenn. Crim. App. Aug. 24, 2021) (citing *State v. Adams*, 405 S.W.3d 641, 656 (Tenn. 2013)).

Challenges to juror qualifications fall into two categories: propter defectum or propter affectum. *Carruthers*, 145 S.W.3d at 94. The propter defectum category includes general disqualifications such as alienage, family relationship, or statutory mandate. *Id.* Challenges falling into the propter defectum category must be made prior to the jury returning its verdict. *Id.* The propter affectum category includes disqualifications arising from the juror's bias, prejudice, or partiality towards one party in the matter. *Id.* Such partiality may be challenged after the jury returns its verdict but must be demonstrated to actually exist or be presumed to exist from the circumstances. *Id.* The juror partiality challenge in this case falls into this latter category.

"An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *State v. Smith*, 418 S.W.3d 38, 45 (Tenn. 2013). Voir dire is the primary tool used by counsel for the parties to a lawsuit to "ensure that jurors are competent, unbiased[,] and impartial." *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011). "Counsel's full knowledge of the facts that might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and for-cause challenges." *State v. Mobley*, No. E2020-00234-CCA-R3-CD, 2021 WL 3610905, at *22 (Tenn. Crim. App. Aug. 16, 2021) (citing *State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993)). Accordingly, it is incumbent upon jurors to make "full and truthful answers . . . neither falsely stating any fact nor concealing any material matter." *Akins*, 867 S.W.2d at 355 (quoting 47 Am. Jur. 2d, Jury § 208 (1969)).

In *State v. Akins*, this court observed regarding raising a propter affectum challenge on the basis of juror bias:

> After establishing that the challenge may be maintained, a defendant bears the burden of providing a prima facie case of bias or partiality. *See State v. Taylor*, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983). When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises. *Durham v. State*, 188 S.W.2d 555, 559 (Tenn. 1945). Silence on the juror's part when asked a question reasonably calculated to produce an answer is tantamount to a negative answer. 47 Am.Jur.2d § 208 (1969) (counsel has right to rely on silence as negative answer); *see Hyatt v. State*, 430 S.W.2d 129, 130 (Tenn. 1967) ("[j]uror . . . by his silence . . . acknowledged"). Therefore, failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality, *Hyatt v. State*, 430 S.W.2d 129 (Tenn. 1967); *Toombs v. State*, 270 S.W.2d 649 (Tenn. 1954); *Durham v. State*, 188 S.W.2d 555 (Tenn. 1945), "the theory being that a prejudicial bias has been implanted in the mind which will probably influence the judgment." 188 S.W.2d at 558.

*Akins*, 867 S.W.2d at 355-56.

Ms. Spalding asserts that what has actually occurred with regard to application of this framework in much of subsequent Tennessee jurisprudence, and in this case by the trial court, is that a presumption in this context has not truly been treated as a legal presumption as the concept is conventionally understood. She seeks to have this court apply a true legal presumption in this case.

Part of the tension that Ms. Spalding perceives is a result of overreading the scope of where the presumption of bias or prejudice actually arises in this context. She understands the presumption of actual bias or prejudice to apply wherever there is a non-disclosure or false response to a question posed in voir dire. That simply is not, however, what Tennessee law provides for in this area. For example, in support of her assertion of error by the trial court, Ms. Spalding cites to the post-*Akins* case of *State v. Baker*, 956 S.W.2d 8 (Tenn. Crim. App. 1997). *Baker*, however, reflects that non-disclosure or concealment by a juror does not in and of itself lift the burden from a defendant to establish actual bias or prejudice. To the contrary, *Baker* provides that "[w]hen a juror's apparent misrepresentation or concealment of information during voir dire examination is challenged during a hearing incident to the motion for a new trial, the accused, as the moving party, has the burden of showing he or she incurred actual bias or prejudice as a result of the failure to reveal the information." *Id*. at 16. Despite a showing that the juror had failed to disclose in *Baker*, this court applied no presumption and instead noted the

defendant's failure to show actual prejudice or bias. *Id*. at 15-16. In other words, as a starting point, the burden to present evidence to show actual bias or prejudice remains with the defendant, rather than an automatic presumption of actual bias or prejudice arising from a juror's concealment or non-disclosure.

Dozens of Tennessee cases, including *Akins*,[3] have noted that presumption of actual bias or prejudice arises not in all circumstances of concealment or non-disclosure but instead when "a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality." *See*, *e.g.*, *Smith*, 357 S.W.3d at 348; *Carruthers*, 145 S.W.3d at 95. To give rise to a presumption, "[t]he question must be material and one to which counsel would reasonably be expected to give substantial weight." *Akins*, 867 S.W.2d at 356 n.12. Accordingly, "[i]nsignificant nondisclosures will not give rise to a presumption of prejudice." *State v. Stanhope*, 476 S.W.3d 382, 403 (Tenn. Crim. App. 2013) (quoting *Akins,* 867 S.W.2d at 356 n.12)). Alternatively, "a presumption arises from this willful concealment of ulterior and prejudicial motives." *Durham*, 188 S.W.2d at 559. The Tennessee Supreme Court has further "recognized that potential bias arises if a juror has been involved in a crime or incident similar to the one on trial." *Smith*, 357 S.W.3d at 347. Additionally, "[c]ircumstances giving rise to a presumption of bias include a juror's willful concealment of prior involvement as the prosecuting witness in a similar case or a juror's concealment of a close personal or familial relationship with one of the parties involved in the trial." *State v. Blankenship*, No. E2024-00942-CCA-R3-CD, 2025 WL 3200774, at *13 (Tenn. Crim. App. Nov. 17, 2025).

A steady undercurrent in the case law and a key component that must be carefully considered on a case-by-case basis is the significance of the "material question(s)" put to the jurors assessed in the context of the specific case. *Akins* itself is reflective of this. Therein, this court considered a propter affectum challenge arising from a juror's failure to disclose professional history in connection with alcohol abuse. The defendant was on trial for vehicular homicide, driving under the influence of an intoxicant, and driving on a revoked license. These charges resulted from his driving his vehicle off the road and into a tree, killing his passenger wife. During voir dire, the potential jurors were asked specific questions about any history they had working with alcoholics or having "formerly [been] from law enforcement." Juror X offered no responses to these questions in spite of her work history including serving as a probation officer, a DUI probation counselor, and working at a hospital in an alcohol and drug rehabilitation program. Juror X was empaneled and was elected foreperson of the jury. After the jury convicted the defendant as charged, another juror advised defense counsel about comments Juror X made regarding her experiences with alcoholics. A propter affectum challenge ensued. Called to testify at the motion for new trial hearing, Juror X admitted that "she discussed her work experience with other jurors [and] told them she 'knew what alcoholics were like.'"

---

[3] *Akins*, 867 S.W.2d at 355.

21

The trial judge denied the defendant's motion for new trial. On appeal, this court acknowledged a defendant's constitutional rights to trial by an impartial, unbiased jury. This court explained that "[b]ias in a juror is a 'leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; [a] bent; [an] inclination.'" *Akins*, 867 S.W.2d at 354 (quoting *Durham*, 188 S.W.2d at 559). This court cautioned that "[j]urors who have prejudged certain issues or who have had life experiences or associations which have swayed them 'in response to those natural and human instincts common to mankind,' interfere with the underpinnings of our justice system." *Id.* (quoting *Durham*, 188 S.W.2d at 559).

In *Akins*, the information the juror failed to disclose pertained to a material facet of the case: the defendant's alcohol use and the fatal consequences thereof. Given her work history, the juror could reasonably be expected to have strong pre-existing opinions about alcohol use and the attempts by government to limit (or at least punish) alcohol abuse. Had the juror disclosed her professional history during voir dire, the lawyers for both the State and the defendant would have had the appropriate opportunity to question her further about her work experience and, moreover, to seek her exclusion from the jury.

The cases the *Akins* Court relied on also illustrate the significance of the circumstances of the specific case in determining whether a presumption of bias or prejudice arises from a juror's failure to disclose or concealment of information. In *Hyatt*, the challenged juror bore such (undisclosed) specific ill will toward one of the Defendants that the court labeled the juror "hostile." 430 S.W.2d at 130. In *Toombs*, the juror failed to disclose that he was first cousin to the victim's wife and that their families socialized together. 270 S.W.2d at 650-51. In *Durham*, the juror failed to disclose that he was the "prosecutor" in a case very similar to the defendant's case. 188 S.W.2d at 559. In all of these cases, as well as in *Akins*, the undisclosed information was plainly and inherently indicative of at least the danger of bias against the defendant as reflected in the particular circumstances of that case. Similarly, as noted above, the Tennessee Supreme Court has also recognized that "potential bias arises if a juror has been involved in a crime or incident similar to the one on trial." *Smith*, 357 S.W.3d at 347; *see also*, *e.g.*, *Sexton v. State*, No. E2018-01864-CCA-R3-PC, 2019 WL 6320518, at *1-7, 12-14 (Tenn. Crim. App. Nov. 25, 2019) (concluding in a prosecution for murders where the underlying circumstances involved abuse and threats by the defendant that a juror who failed to disclose she was a victim of domestic violence in response to a question about having been a victim of a crime gave rise to a presumption of bias or prejudice); *State v. Romero*, No. E2013-02137-CCA-R3-CD, 2014 WL 7010815, at *13 (Tenn. Crim. App. Dec. 12, 2014) (applying the presumption of actual bias or prejudice in a case involving criminal prosecution for child sexual abuse where the juror failed to disclose, despite questioning, that his father had been tried twice for sexually abusing his niece, where the juror had sat through the duration of both trials expressing hostility toward his father, who had not been convicted); *Faulkner v. State*, No. W2012-00612-CCA-R3-PD, 2014 WL 4267460, at *77-78 (Tenn. Crim. App. Aug. 29, 2014) (concluding that the presumption of actual bias or prejudice arose from

concealment where a juror falsely denied being a victim of domestic violence in a prosecution for murder involving domestic violence).

The question to which Juror J.E.K. purportedly answered incompletely was an extremely broad question about encounters with police. In the present case, Ms. Spalding did not call Juror J.E.K. at the hearing on the motion for a new trial nor did she obtain an affidavit from Juror J.E.K.. There is no indication in the record that she attempted to do either. Instead, Ms. Spalding presented extremely limited evidence in connection with this matter. She presented evidence indicating a person named J.E.K., the same name as a juror, had two misdemeanor convictions more than twenty years old. While an address associated with the person convicted of the offenses was not the same as the juror's address, Ms. Spalding presented evidence that a website connected the name J.E.K. with both the Ringgold address, the juror's address, and the Duke St. address, the address associated with the prior convictions. No specific information or particulars were presented in connection with the circumstances of these offenses. Instead, what was established was that on June 19, 2001, someone with the same name as the juror pled guilty to 39-13-101 Assault - Fear of Bodily injury A Misdemeanor and 39-16-602 Resisting Stop, Frisk, Halt, Arrest, or Search B Misdemeanor. The trial court imposed for these offenses a sentence of probation including eight weeks of anger management, and the termination of that probation was recognized on December 5, 2001. And a website associated both the address of the person who pled guilty to these offenses and the juror's address as being connected with a person with the same name. No other information was presented to the trial court regarding these offenses.

In considering whether willful concealment or non-disclosure warranted application of a presumption of bias or actual prejudice in this case, the trial court judge applied the appropriate legal standard. The trial court expressly noted, as delineated in the standard set forth above, that "[w]here the willful concealment or failure to disclose reflects directly on the juror's lack of impartiality, prejudice or bias is presumed although the presumption can be overcome." Applying this standard to the present case, the trial court concluded that "[h]ere, the failure to disclose does not reflect directly on the juror's lack of impartiality as the non-disclosure relates to a twenty-year-old misdemeanor assault for which the juror successfully completed six months of probation." Faced with this paucity of proof, the trial judge concluded that Ms. Spalding had failed to demonstrate that the failure to disclose these offenses gave rise to a presumption of actual bias or prejudice.

Given the shortcomings in the proof that was presented to the trial court regarding this matter, we find no error in the trial court's conclusion. In the present case, we know almost nothing about the circumstances of these more than twenty-year old offenses or why they were not disclosed. To warrant application of the presumption, a defendant must show how the non-disclosure or concealment "reflects directly on the juror's lack of impartiality" considered in light of the specific case. The connection between the present case and these prior convictions, as it relates to materiality, and whether the nondisclosure

23

was even willful, is simply too unclear to establish that the trial court erred in failing to apply the presumption of actual bias or prejudice in this case. Accordingly, Ms. Spalding has failed to demonstrate that any non-disclosure by juror J.E.K. in this case "reflects on the juror's lack of impartiality." *See*, *e.g.*, *Smith*, 357 S.W.3d at 348. It takes more to trigger a presumption of actual bias or prejudice than the showing that has been made in this case.

B.

We turn next to Ms. Spalding's contention that the trial court committed reversible error by denying the admission of the audio recording of the "dispatch transmission" recorded at 1:16 p.m. on July 4, 2018, between the dispatcher and Officer Denson.[4] The dispatcher is recorded as asking Officer Denson if it was okay "to change this to a code 2. Ah 54, he wasn't brandishing the guns, so one of them had it in the car. And . . . He just approached 17 [the victim] with it. Not with a gun but with his story." Officer Denson replied, "Yeah that's fine." The trial court excluded this evidence at trial. In its order denying the motion for new trial upon this issue, the trial court stated the following:

> 1. Error in declaring inadmissible properly authenticated dispatch records – Although properly authenticated, the dispatches were nonetheless either irrelevant or based on hearsay. The dispatch was in reference to a change in the nature of the call for assistance to withdraw that a weapon was being brandished. If this change was prompted by the officer's observations who first arrived on the scene, then the information was irrelevant since the suspects were no longer on the scene when the officer arrived. If the officer requested the change based on information received from a third party after arriving at the scene, the information would be hearsay since it was an[] out of court statement by an unknown declarant being offered to prove [the truth] of the matter asserted by the declarant. In any event, it was established through the lead detective Jesse Holt that the first responding officer, Faye Denson, did not reference that Mr. Johnson aimed a weapon at the victim.

Ms. Spalding argues that the contested recording should have been admitted into evidence and that the trial court committed reversible error by excluding the audio recording. In support of this position, she offers three arguments. One, she argues that the recording was proffered not for the truth of the matter asserted therein, but to demonstrate "its effect on the listener," i.e. the dispatcher. Two, she argues that, even if offered for the truth of the matter, the recording should have been admitted pursuant to the business

---

[4] Although the transmission does not identify Officer Denson by name, her testimony and that of Ms. Franklin allows us to draw the inference that the recording was of one of Officer Denson's calls with dispatch.

records exception to the hearsay rule. Three, she insists that the State opened the door to admission of this evidence through its own questioning.

As explained by the Tennessee Supreme Court,

The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule—are questions of law subject to de novo review.

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible except as provided for by the Tennessee Rules of Evidence or, otherwise, by law. Tenn. R. Evid. 802.

We turn first to Defendant's Spalding's argument that the statements in the recording are not hearsay because she is not offering the evidence for the truth of the matter asserted. Ms. Spalding makes plain in her brief that the purported prejudice of exclusion is that the statement shows that there was not a gun used in the encounter. Ms. Spalding wanted the excluded statement admitted precisely for the truth of the matter asserted: to negate Mr. Kelly's assertion that Mr. Johnson pointed a gun at him. Simply stated, the purpose of offering the statement into evidence is for the truth of the matter asserted, and Ms. Spalding's attempt to suggest otherwise is unconvincing and internally contradictory.[5]

---

[5] Indeed, Defendant Spalding asserts in her brief that she

intended to introduce this audio recording to impeach Mr. James Kelly's testimony that Mr. Johnson and (through criminal responsibility of another) Ms. Spalding held him at gun point. . . . The introduction of this audio recording was an important element to the Defense's case. Its denial (if improper) was highly prejudicial to the Defendants. If the jury had been allowed to hear this recording, Defense would have been able to argue, with the proof on the record, that a weapon was possibly not on the scene; opening reasonable doubt to the elements of Especially Aggravated Kidnapping use of a weapon (as was alleged in this case). This prejudiced the Defense's case.

Turning to her second argument, Ms. Spalding argues this statement is admissible under the business records exception. *Arias v. Duro Standard Prods. Co.*, 303 S.W.3d 256, 259 (Tenn. 2010) (noting that "the hearsay exception for records of regularly conducted activity" is "often referred to as the business records exception"). While hearsay is generally inadmissible, certain hearsay statements are admissible under exceptions listed in the Tennessee Rules of Evidence. *See* Tenn. R. Evid. 803. The so-called business records exception to the exclusion of hearsay statements provides as follows:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information *transmitted by a person with knowledge and a business duty to record or transmit* if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Tenn. R. Evid. 803(6) (emphasis added). Additionally, "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law." Tenn. R. Evid. 805.

The statement Ms. Spalding sought to have admitted was the 1:16 p.m. exchange between Officer Denson and dispatch, including the statement that there had not been a gun brandished at the scene. However, as noted by the trial court, this information could not have been based on Officer Denson's own observations because she arrived at the Kroger parking lot after the Defendants had already left. The statements could not have been based on the observations of a dispatcher who was never on the scene. Any statements made by Mr. Kelly to Officer Denson or to the officer who initially spoke to Mr. Kelly in the parking lot were hearsay statements that would not be covered by the business records exception because Mr. Kelly was under no business duty to transmit any particular information to the officers. *See, e.g.*, *State v. Winters*, No. 02C01-9802-CR-00053, 1999 WL 628968, at *9 (Tenn. Crim. App. Aug. 19, 1999) (noting that a "crimestopper tip, even though contained in a police report, is not admissible as a business record where the declarant is not under a business duty to give the information") (citing *State v. Allen*, 692 S.W.2d 651, 653 (Tenn. Crim. App. 1985)).

---

Clearly, the evidence was being offered for the truth of the matter asserted.

Thus, to be admissible, Mr. Kelly's statements had to conform to some other exception to the hearsay rule. *See* Tenn. R. Evid. 805. Ms. Spalding, however, has not suggested any other theory of admissibility to the trial court, nor does she suggest any other theory of admissibility to this court. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed v. Bd. of Prof'l Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

Ms. Spalding advances a third argument contending that the evidence should have been admitted because the State opened the door to the issue by asking the records keeper, Ms. Herlein, about the reasons that might give rise to a code change. Ms. Spalding provides no citations to legal authority for this contention, only a conclusory assertion that this is the legal consequence of the State's question. Given the lack of any authority to support her contention, this argument is waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). *See also* Tenn. R. App. P. 27(a)(7) (requiring an appellant's brief to set forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on"); *State v. Vaughn*, 279 S.W.3d 584, 595-96 (Tenn. Crim. App. 2008) (holding that defendant waived review of issue "by failing to cite any legal authority in support of his argument") (citing Tenn. Ct. Crim. App. R. 10(b), Tenn. R. App. P. 27(a)(7)).

Finally, even if the trial court did commit error in excluding this evidence, the error was harmless. We address a trial court's erroneous ruling on the admissibility of evidence under the harmless error analysis of Tennessee Rule of Appellate Procedure 36(b). *See State v. Clark*, 452 S.W.3d 268, 288 (Tenn. 2014); *see also State v. Tate*, No. W2006-00997-CCA-R3-CD, 2007 WL 1966020, at *5 (Tenn. Crim. App. July 5, 2007) (recognizing that a reversal for the erroneous exclusion of evidence is required only if the error "affirmatively appears to have affected the trial on the merits") (quoting *State v. Harris*, 989 S.W.2d 307, 315 (Tenn. 1999)). Tennessee Rule of Appellate Procedure 36(b) provides that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Under Rule 36(b), Ms. Spalding bears the burden of demonstrating that the erroneously excluded evidence "more probably than not" affected the verdict. *See Clark*, 452 S.W.3d at 288.

> To conduct a review under Tennessee Rule Appellate Procedure 36(b), we review the entire record in order to ascertain the actual evidentiary basis for the jury's verdict. The crucial consideration is what impact the error may reasonably have had on the jury's decision-making process. When the error more probably than not had a substantial and injurious impact on the jury's decision-making process, it is not harmless. In general, the more evidence

there is to support the defendant's guilt, the more likely it will be that the error was harmless.

*Id.* (citing *State v. Rodriguez*, 254 S.W.3d 361, 371-72 (Tenn. 2008).

Ms. Spalding has failed to demonstrate that the excluded dispatch transmission more probably than not affected the verdict. Not only did the jury hear the 911 recording in which Mr. Kelly reported being threatened with a gun, it heard Mr. Kelly testify that Mr. Johnson pointed a gun at him. Furthermore, while Mr. Johnson denied pointing a gun at Mr. Kelly, his recorded conversation with Detective Holt placed the weapon outside the vehicle. Additionally, in terms of any benefit to the Defendants, the jury already had before it proof that initial police reports concerning what had occurred were confused and/or conflicting. Furthermore, while the dispatch recording itself did not come into evidence, the testimony regarding this code change did come into evidence. Additionally, the fact that Officer Denson had not put into her police report any statement indicating that a gun had been brandished came into evidence. Clearly, the jury believed Mr. Kelly's accounts of what occurred, which were in accordance with the 911 call recording made immediately in the wake of the encounter. Ms. Spalding has failed to show that if the jury had been provided with the 1:16 p.m. exchange between Officer Denson and dispatch that this would have more likely than not affected its verdicts. Ms. Spalding is not entitled to relief on this basis.

C.

Ms. Spalding also contends that the trial court erred in its application of two enhancement factors in its sentencing decision and thereby erred in failing to sentence her as an especially mitigated offender. This court reviews a trial court's sentencing decisions under an "abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)). The party challenging the sentence on appeal bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016).

Before imposing sentence, a trial court must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report, including a validated risk and needs assessment; (3) any arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any applicable mitigating and enhancement factors; (6) any statement the defendant makes on his behalf; and (7) statistical information provided by the administrative office of the courts as to sentencing practices for similar

28

offenses in Tennessee. Tenn. Code Ann. § 40-35-210(a), (b). Additionally, the sentence imposed should be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

When determining the length of a sentence within the appropriate range, a trial court is guided by, but not bound by, any applicable mitigating and enhancement factors. *State v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at *21 (Tenn. Crim. App. Apr. 2, 2024) (quoting *Bise*, 380 S.W.3d at 706), *no perm. app. filed*. The weight assigned to any applicable mitigating or enhancement factors is within the trial court's sound discretion. *State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15 (Tenn. Crim. App. Mar. 20, 2024) (quoting *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008)), *no perm. app. filed*.

As set forth above, the trial court first found that Ms. Spalding was a Range I offender and noted that there were no sentencing alternatives available. *See* Tenn. Code Ann. § 40-35-112(a)(1) (mandating that a Range I sentence for a Class A felony is fifteen to twenty-five years); Tenn. Code Ann. § 40-35-501(i)(2)(C) (noting that sentences for especially aggravated kidnapping must be served at 100 percent). It then found applicable two enhancement factors: first, that, based on her methamphetamine use prior to trial, Ms. Spalding had "a previous history of . . . criminal behavior, in addition to [that] necessary to establish the appropriate range," Tenn. Code Ann. § 40-35-114(1), and second, that she had been "a leader in the commission of an offense involving two (2) or more criminal actors," Tenn. Code Ann. § 40-35-114(2). The trial court's application of these two enhancement factors rendered Ms. Spalding ineligible for sentencing as an especially mitigated offender. *See* Tenn. Code Ann. § 40-35-109(a) ("The court may find the defendant is an especially mitigated offender, if: (1) The defendant has no prior felony convictions; and (2) The court finds mitigating, but no enhancement factors.").[6] Accordingly, if either enhancement factor was properly applied, then Ms. Spalding could not have been found to be an especially mitigated offender.

With respect to the trial court's application of the enhancement factor based on Ms. Spalding's use of methamphetamine, Ms. Spalding asks this court to "address if it is proper to use medical information disclosed to gain a thorough understanding of medical diagnosis" as a basis for enhancing a defendant's sentence. She contends that this use of disclosed information "could certainly create a chilling effect regarding the need to fully and properly disclose all health issues to medical providers for fear of reprisals for being honest."

---

[6] The result of being sentenced as an especially mitigated offender is a ten percent reduction in the sentence imposed or a reduction of the release eligibility date to twenty percent or both. *See* Tenn. Code Ann. § 40-35-109(b).

Initially, we note that Dr. Bitting's written report provides that he informed Ms. Spalding about the purpose of the report and that it would not be confidential. She indicated that she understood this information. Moreover, Dr. Bitting was not employed to formulate a medical diagnosis of Ms. Spalding nor was he employed to render a treatment plan. While a disclosure of illicit drug use might, indeed, be helpful in formulating a medical diagnosis and dispensing treatment, that was not the purpose of Dr. Bitting's interviews with Ms. Spalding. Ms. Spalding employed Dr. Bitting to perform a "forensic psychological evaluation" in order to "identify any mental health factors that may be relevant to [her] sentencing hearing."

Ms. Spalding chose to begin using methamphetamine after she was arrested on the instant charges. She told Dr. Bitting that she was "introduced to the drug" by Mr. Johnson. In spite of facing the consequences of serious criminal charges arising out of her behavior with Mr. Johnson, Ms. Spalding continued to commit criminal behavior with him after her arrest. The trial court stated, "I don't know why she all of the sudden took that turn in the road for some period of time. . . . I just don't know how she ended up going that direction . . . . But be that as it may, it is criminal behavior and therefore applies to her."

This Court has previously held that a defendant "is not entitled to relief [from the application of the previous criminal behavior enhancement factor] simply because he was truthful with the hope that the trial court would look favorably at his truthfulness." *State v. Hoyle*, No. W2023-01129-CCA-R3-CD, 2024 WL 3333970, at *8 (Tenn. Crim. App. July 9, 2024)). Ms. Spalding admitted recreational illicit drug use. She seeks to block consideration of that admission based on concerns about interfering with communication that may be critical for obtaining proper medical diagnosis in connection with receiving proper treatment. That concern is inapplicable in this case where Ms. Spalding knew the witness was not treating her and that the witness was instead conducting an evaluation purely for purposes of presenting evidence at her sentencing hearing. We hold that the trial court did not err in applying this enhancement factor.

As set forth above, a trial court may sentence a defendant as an especially mitigated offender only if the defendant "has no prior felony convictions," there are no applicable enhancement factors, and there are applicable mitigating factors. Because we have determined that the trial court properly applied this enhancement factor, Ms. Spalding was not eligible to be sentenced as an especially mitigated offender. Accordingly, she is entitled to no relief on this basis.

IV.

Based on the foregoing reasoning, we affirm the judgments of the trial court.


s/ Jeffrey Usman
JEFFREY USMAN, SPECIAL JUDGE

30